# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

SHAWN W.,

                                        Plaintiff,

        v.

                                                        1:20-CV-1513
KILOLO KIJAKAZI, ACTING                                 (ATB)
COMMISSIONER OF SECURITY,

                                        Defendant.

IRWIN M. PORTNOY, ESQ., , for Plaintiff
LISA SMOLLER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

On April 3, 2018, plaintiff filed an application for a period of disability and disability insurance benefits ("DIB"), alleging that he became disabled on September 11, 2014. (Administrative Transcript ("T.") 19, 154-60).  The claim was denied initially on August 24, 2018. (T. 90-94).  Plaintiff requested a hearing, which was held on December 11, 2019 before Administrative Law Judge ("ALJ") Dale Black-Pennington. (T. 41-74).  Plaintiff testified at the hearing, represented by counsel. (*Id.*)  ALJ Black-Pennington issued an unfavorable decision on February 3, 2020, which became the

Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 6, 2020.[1] (T. 1-5 (AC Denial), 19-35 (Hearing Decision)).

## II.   GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

---

[1] As noted by ALJ Black-Pennington in her decision, plaintiff filed a previous application for disability benefits on April 1, 2015, which was denied initially on July 1, 2015. (T. 19).  A different ALJ issued an unfavorable decision on March 15, 2017, and the Appeals Council denied plaintiff's request for review on March 28, 2018, making it Commissioner's final decision. (*Id.*)  Plaintiff did not further appeal the Commissioner's March 28, 2018 decision. (*Id.*)  ALJ Black-Pennington specifically stated that any discussion of the evidence prior to March 28, 2018 was for "historical and contextual purposes only and [did] not constitute reopening." (T. 19).  Plaintiff has raised an issue regarding reopening which I will discuss below.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

3

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III. **FACTS**

Plaintiff was born on August 24, 1965 and was 54 years old at the time of the ALJ's hearing. (T. 45). Plaintiff is married and lives alone with his wife, who works full-time as a nurse. (T. 46-47). Plaintiff testified that he had a drivers' license, and he could drive, but did not drive very far. (T. 47). Although his wife drove him an hour to the ALJ's hearing, plaintiff testified that he had no problem getting there. (*Id.*) Plaintiff has a high school diploma and testified that he had no problem reading, writing, or

doing mathematics. (T. 47-48).  Plaintiff also testified that he had BOCES[2] training in "conservation." (T. 48).

Plaintiff's last work was as an "Operating Engineer" for a union contractor. (*Id.*) Plaintiff left that job on September 12, 2014[3] after he was injured at work and has not worked since that time. (T. 48-49).  Plaintiff testified that he injured his hip, and that this injury was the basis for his failure to return to work. (T. 49).  He stated that he never looked for any other employment because he did not feel like there was anything else that he could do. (*Id.*)  Plaintiff testified that his knees, both hips, left ankle, and left shoulder, together with back pain, limited his ability to work. (T. 49-50).  Plaintiff testified that he was in pain all day, every day, most of the time, "as long as" he was on his feet, and even if he sat "at times for long periods." (T. 50-51).  For pain relief, plaintiff sat, rested, or took Tylenol.[4] (*Id.*)  Plaintiff took a variety of other non-pain medications, including Losartan for his blood pressure and Klonopin for his anxiety and depression. (T. 51-52).  Plaintiff testified that the Klonopin was helping his anxiety, but it made him drowsy/sleepy. (T. 52).

Plaintiff testified that he could only walk about 100 yards before his legs, knees, hips, and back began to bother him. (T. 53).  Plaintiff stated that he could stand for 20 minutes and could sit for 20 to 40 minutes "at the most." (*Id.*)  He stated that his

---

[2] Boards of Cooperative Educational Services. https://www.boces.org/

[3] Plaintiff's date of onset is September 11, 2014, and the ALJ confirmed that after plaintiff testified that his last day of work was September 12, 2014. (T. 48-49).

[4] Plaintiff later testified that he tried "injections" to relieve the pain, but that they did not work. (T. 60).

dominant hand was his right, and he could lift 20 pounds "regularly." (*Id.*) His carpal tunnel syndrome caused him to drop things "quite a bit," but generally, he had normal use of his hands. (*Id.*) Later, plaintiff testified that if he was making coffee, doing dishes, or grabbing something out of the refrigerator, he dropped things. (T. 58-59). However, he did not have trouble performing fine manipulations. (T. 59).

Plaintiff testified that his depression caused him to have some memory problems, and that he had a lot on his mind, so that he forgets "numbers" and things that he "has to do." (T. 53-54). However, he could follow a story on television and could read and follow stories when he read the morning newspaper. (T. 54). Plaintiff did not like to be in crowds of more than 20 people and had some shortness of breath if he climbed stairs or walked long distances. (*Id.*) Plaintiff slept only about four hours per night. (T. 54-55).

Plaintiff took care of his own personal hygiene daily, ran the vacuum, and accompanied his wife to grocery shop once per week.[5] (T. 55). Plaintiff's wife did the cooking, but plaintiff could make himself lunch if his wife was at work. (*Id.*) Plaintiff enjoyed watching hockey twice a week, but did not have other hobbies and did not belong to any churches, lodges, community groups, or other organizations. (*Id.*) In response to questioning by his attorney, plaintiff testified that, if he lifted or worked too much with his joints, the next day he would be so sore that he could "hardly move." (T. 56). Plaintiff also testified that he took breaks 15 or 20 minutes if he was doing

---

[5] Later, plaintiff testified that grocery shopping was an ordeal, that he had to lean on the cart, and by the time he was done, his back and his legs were "burning." (T. 61). When he got back home, he had to sit and rest them. (T. 62).

household chores. (T. 56-57).  His wife did the laundry because the laundry room was in the basement, and plaintiff was afraid of falling because he had trouble with balance. (T. 57).  He stated that, recently, he had fallen three times. (*Id.*)

Plaintiff testified that he was going to have to undergo a knee replacement but was waiting until his recent ankle tendon replacement healed. (*Id.*)  He stated that his ankle was still sore, notwithstanding the surgery. (*Id.*)  Plaintiff had already undergone two hip replacement surgeries, and if he sat on the couch for too long, he would have a significant amount of lower body numbness which he relieved by standing "until it goes away," then sitting back down.[6] (T. 58).  Plaintiff testified that the problems with his shoulder prevented him from lifting more than 20 pounds, or "lift it" over his head. (*Id.*)  Although he testified that the impairment affected his ability to "reach," he did not cite any specifics. (*Id.*)

Plaintiff testified about his sleep apnea, which disrupted his sleep and caused him to be tired during the day, causing him to fall asleep on the couch from 20 minutes to 2 hours daily. (T. 59). Plaintiff also stated that he had cardiac impairments, and that he had undergone three cardiac ablations, two of which had failed, while the third "so far is okay." (T. 60).  Plaintiff testified that he had good and bad days, but he had about four "bad" days per week, during which he would not be in a good mood. (T. 60-61).  However, he tried to get out of the house and drive around "the block" with his dog. (T. 61).  Occasionally, plaintiff went to a wrestling match with his brother. (*Id.*)

---

[6] Later plaintiff stated that he had been diagnosed with "Meralgia Paresthetica," which caused numbness in his legs if he stood for an extended period of time. (T. 59-60). When this occurred, plaintiff would have to sit for 5 to 10 minutes until he could stand again. (T. 60).

Plaintiff testified about his alcohol consumption. (T. 62-63).  Plaintiff stated that he drank 6-12 cans of beer three times per week. (T. 63).  Plaintiff testified that he used the alcohol as a "self-medicator [sic]," but that he was working on it, and he was "trying to slow down." (*Id.*)  Plaintiff stated that he spoke to his primary care physician about his mood. (*Id.*)

The ALJ took testimony from VE Cherie Plant. (T. 64-72).  VE Plante stated that plaintiff's previous work as an operating engineer was medium in exertional level with an SVP of 6.[7]  The first hypothetical question posed by the ALJ assumed an individual of the plaintiff's age education and prior work experience who was able to lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, was able to stand, walk, or sit for six hours of an eight hour day, but required "the ability to change positions for comfort." (T. 66).  The individual would be able to occasionally climb ramps or stairs, occasionally crawl, and occasionally reach in all directions with his left hand. (*Id.*)  Finally, the individual would be able to occasionally manage change to the workplace environment. (*Id.*)

The VE stated that this hypothetical individual would not be able to perform plaintiff's prior work, but that he could perform the unskilled,[8] light work jobs of sales

---

[7] "Specific Vocational Preparation [SVP], as defined in Appendix C of the Dictionary of Occupational Titles, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." https://www.onetonline.org/help/online/svp.  An occupation with an SVP of six takes over one year and up to two years to learn. *Id.* This was "skilled" work. (T. 66).

[8] The VE testified that, even though plaintiff's prior work was skilled, those skills would only be transferable to medium work, and thus, she chose only unskilled work for this plaintiff, who could only perform a restricted range of light work. (T. 66-67).

attendant, cashier II, and ticket taker. (T. 67).  These jobs were available notwithstanding that, during the period in question, the plaintiff's age went from "younger individual," to someone "approaching advanced age" when he turned 50. (T. 67-68).  The VE specifically testified that the plaintiff's reaching limitation on the left (non-dominant) side would not affect the availability of these jobs because most of the reaching could be done using the dominant right hand. (T. 68).

The VE discussed time off-task and unscheduled absences, however, her estimate of what an employer would allow was "inaudible" in the transcript. (T. 68).  She did state that she knew of no employer who would tolerate 20% time off task. (*Id.*)  The VE stated that an employer would tolerate approximately 6 to 8 unscheduled absences per year, with the possibility of 1 or 2 additional days "for good reason." (*Id.*)  Plaintiff's counsel asked whether the jobs would still be available if the individual could only stand for 20 minutes, but then have to sit down, and if he walked for 20 minutes, he would have to sit down. (T. 70).  The VE stated that the ticket taker and the cashier positions would still be available. (*Id.*)  If the individual were limited to "frequent" handling or reaching with both hands, the jobs would still be available. (T. 72).  However, if the individual could not handle or reach at all, there would be no jobs available. (*Id.*)

There is a substantial amount of medical evidence in the administrative record.  Rather than reciting the evidence at the outset, I will discuss the relevant materials in my analysis of plaintiff's claims.

## IV.   **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff met the insured status requirements for DIB through December 31, 2019, and that plaintiff had not engaged in substantial gainful activity from September 11, 2014 until his date last insured. (T. 21).  The ALJ found the following severe impairments at step two: atrial disorder, status post three ablations; obstructive sleep apnea; left rotator cuff tear, status post left shoulder replacement; hypertension; spinal stenosis and spondylosis; degenerative joint disease of the bilateral hips, status post replacement; bilateral carpal tunnel syndrome; bilateral femoral cutaneous neuropathy; degenerative joint disease of the left ankle, status post tendon repair; degenerative joint disease of the bilateral knees; obesity; major depressive disorder; major anxiety disorder; and alcohol use disorder. (T. 21-22). The ALJ also found that plaintiff's gastroesophageal reflux disorder ("GERD") was non-severe, and his chronic obstructive pulmonary disorder ("COPD") not medically determinable. (T. 22).

At step three, the ALJ found that the severity of plaintiff's impairments did not meet or equal the severity of a listed impairment. (T. 22-25).  The ALJ considered Listings 1.02 (major dysfunction of a joint); 1.04 (disorders of the spine); 4.00H (hypertension as a listed impairment); 4.05 (recurrent arrhythmias); 11.04 (peripheral neuropathy); 12.04 (depressive, bipolar and related disorders); and 12.06 (anxiety and obsessive compulsive disorders). (*Id.*)  Finally, the ALJ considered plaintiff's obesity for which there is no listing, but may be considered as exacerbating "a co-morbid" condition to medically equal a listed impairment. (T. 24).

10

At step four, the ALJ determined plaintiff's RFC, consistent with the limitations expressed to the VE in the hypothetical question. (T. 26-33).  The ALJ found that plaintiff could perform light work, with the exceptions noted above. (*Id.*)  The ALJ further found that plaintiff could not perform his past relevant work.  However, based upon the testimony of the VE, the ALJ found at step five that plaintiff could perform the jobs of Sales Attendant, Cashier II, and Ticket Taker, notwithstanding any additional limitations on plaintiff's ability to reach and his need for positional changes. (T. 34-35).

## V.   **ISSUES IN CONTENTION**

Plaintiff raises the following arguments in support of his position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ erred in finding that plaintiff suffered from alcohol use disorder and that it was a severe impairment. (Pl.'s Br. at 15-16) (Dkt. No. 24).

2.   The ALJ erred in evaluating treating and examining sources and failed to develop evidence relative to plaintiff's carpal tunnel syndrome. (Pl.'s Br. at 16-20).

3.   The ALJ erred in evaluating the Listing of Impairments. (Pl.'s Br. at 20-21).

4.   The ALJ erred in evaluating plaintiff's statements about pain and other limitations. (Pl.'s Br. at 21-23).

5.   The ALJ erred in determining plaintiff's RFC, age, and transferability of skills. (Pl.'s Br. at 23-24).

6.   The ALJ erred in questioning the VE. (Pl.'s Br. at 24-25).

7.   The ALJ erred in failing to reopen the prior application. (Pl.'s Br. at 25-26).

Defendant argues that the ALJ's decision was supported by substantial evidence, and the complaint should be dismissed. (Def.'s Br. at 3-31) (Dkt. No. 27).  For the following reasons, this court agrees with the defendant and will dismiss the complaint.[9]

## VII.  <u>REOPENING</u>

### A.    **Legal Standards**

"Where a claimant seeks to reopen a claim where a final decision has been rendered, the Commissioner may refuse such as request under the doctrine of res judicata." *Saxon v. Astrue*, 781 F. Supp. 2d 92, 99 (N.D.N.Y. 2011) (*citing Dunn v. Astrue*, No. 08-CV-0704, 2010 WL 376390, at *3 (W.D.N.Y. Jan. 27, 2010)). "The Commissioner's decision not to reopen a prior determination is not a final decision for the purposes of § 405(g), and thus federal courts lack jurisdiction to review the administrative decision not to reopen a previous claim for benefits." *Id.* (citing *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003)). "There are two circumstances in which the federal courts may review the Commissioner's decision not to reopen a disability application: (1) where the Commissioner has constructively reopened the case; and (2) "where the claimant has been denied due process." *Id*. (quoting *Byam*, 336 F.3d at 179). Although an ALJ can be deemed to have constructively reopened an application where he reviews the entire record and renders a decision on the merits, "[a] matter is not constructively reopened when the ALJ merely discusses prior proceedings and evidence to describe a claimant's background." *Id.* (citing *Grant v. Shalala*, No. 93-CV-0124, 1995 WL 322589, at *7 (W.D.N.Y. Mar. 13, 1995)).

---

[9] The court will consider plaintiff's arguments out of order for consistency with the sequential analysis.

## B.     Analysis

In this case, the ALJ specifically stated that any discussion of the evidence prior to March 28, 2018 was for "historical and contextual purposes only and [did] not constitute a reopening." (T. 19).  Thus, this court has no jurisdiction to review the final decision not to reopen.  Plaintiff does not make any of the arguments above that could allow this court to assume jurisdiction over such a decision.  He does not claim that the ALJ specifically or constructively reopened the case, and he does not claim that plaintiff was denied due process.  Rather, plaintiff argues that

> Although the administrative record here contained reports reflecting the prior period, that decision was not in file. It may show clear error on the face of the decision by an erroneous RFC considering his age and lack of transferrable skills. 20 C.F.R.§§ 404.988, 989 in the same way that the ALJ did here. The ALJ should have obtained it to decide reopening. *Schaal v. Apfel*, 138 F.3d 496, 503-505 (2d Cir. 1989)[.]

(Pl.'s Br. at 26).

It appears that plaintiff is arguing that the current ALJ should have obtained the prior ALJ's decision in order to make her reopening determination because the prior decision may have been erroneous.[10]  Because plaintiff's argument does not establish either of the exceptions listed above, this court is without jurisdiction to review the Commissioner's decision not to reopen the previous application, and the plaintiff must establish that he became disabled from March 28, 2018 until December 31, 2019, his

---

[10] Plaintiff also noted that the prior decision was governed by the "treating physician rule," and perhaps the relevant analysis would have been more likely to show an error by the ALJ.  However, plaintiff's argument is conclusory and does not establish the requirements for either exception to the rule governing reopening.

date last insured.

## VIII.  <u>SEVERE IMPAIRMENT</u>

### A.    **Legal Standards**

A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) (noting that an impairment is not severe at step two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).  "Severity" is determined by the limitations imposed by an impairment, and not merely by its diagnosis.  The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe.  *Monique Danielle W. v. Comm'r of Soc. Sec.,* No. 5:18-CV-184 (DNH), 2019 WL 2358529, at *4 (N.D.N.Y. June 4, 2019) (quoting *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 152 (N.D.N.Y. 2012)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal

effect on an individual's ability to work.'" *Mark K. v. Comm'r of Soc. Sec. Admin.,* No. 5:18-CV-627 (GLS), 2019 WL 4757381, at *1 (N.D.N.Y. Sept. 30, 2019) (quoting *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985).  However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work, will not be considered severe.  *Id.*  The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*

The step two analysis "may do no more than screen out *de minimis* claims."  *Vogt on behalf of Vogt v. Comm'r of Soc. Sec.,* No. 18-CV-231, 2019 WL 4415277, at *4 (W.D.N.Y. Sept. 16, 2019) (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)).  If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at step three through step five.  *Dixon,* 54 F.3d at 1030.

## B.    Analysis

Generally, plaintiffs argue that the ALJ erred in failing to find that an impairment was severe.  In this case, plaintiff argues that the ALJ erred in determining that plaintiff's alcohol use disorder was severe.  Plaintiff argues that no acceptable medical source diagnosed such a disorder, and that the ALJ's error somehow affected the way

that she evaluated plaintiff's other impairments. (Pl.'s Br. at 16). Plaintiff's argument has no merit.

As defendant points out, at step two, the ALJ found that plaintiff's alcohol abuse disorder was severe. (T. 22). In June 2018, consultative examiner Dr. Robert Greene, M.D. specifically diagnosed "Alcoholism." (T. 470). During the examination, plaintiff admitted to drinking six to eight, and sometimes twelve beers per day. (T. 468). On March 11, 2016, in a preoperative cardiology consultation, Dr. Bashir Iqbal, M.D. noted that one of plaintiff's "problems" was alcohol abuse, even though he later wrote "history of alcohol abuse." (T. 409, 410). The doctor noted that, although plaintiff had cut down on his drinking "significantly," he had "binge drinking episodes" two to three times per month. (T. 409). In August of 2016, Dr. Iqbal again listed one of plaintiff's "problems" as "alcohol abuse." (T. 412). He noted that plaintiff had cut down on his drinking, but "when he does drink, he drinks 12 beers." (T. 412).

In February of 2017, Dr. Iqbal observed that plaintiff was drinking 15 beers "at least 3-4 times per week." (T. 414). Dr. Iqbal's "problem list" included alcohol abuse, and his "impression" included "history of alcohol abuse." (T. 414, 415). On September 6, 2017, Dr. Iqbal noted that since plaintiff's last visit, he was "binge drinking a 12 pack of beer more than four times a week." (T. 417). His "impression" included "history of alcohol abuse." (T. 418). In March of 2018, Dr. Iqbal noted that plaintiff was only drinking on the weekends, but he drank 10 to 15 beers each day Friday through Sunday. (T. 421).

In September of 2018, Dr. Iqbal noted that plaintiff was drinking six beers a day,

16

sometimes more. (T. 487).  While his impression again noted a "history" of alcohol

abuse (T. 488), his problem list specifically stated "alcohol abuse" (T. 488), and it was

clear from the doctor's note that plaintiff was still drinking. (T. 487).  On October 19,

2018, in an electrophysiology consultation, Dr. Henry Tan, M.D. noted that plaintiff

still drank a "six pack or so" four times per week. (T. 497).  On December 5, 2019,

plaintiff's treating physician, Donald R. Merrihew, M.D. wrote a letter, stating that one

of plaintiff's "disabilities" was "Alcoholism." (T. 581).

Plaintiff argues that neither consultative examining psychologist, Brett T.

Hartman, Psy.D. nor non-examining psychologist T. Bruni, Ph.D. diagnosed alcohol

abuse disorder.  While it is true that Dr. Bruni did not diagnose or mention plaintiff's

alcohol abuse (T. 82-83), Dr. Hartman noted both plaintiff's alcohol and cannabis use.

In his diagnoses, he wrote: "Rule out cannabis and alcohol use disorder." (T. 461-62)

(noting that plaintiff drank 6-12 cans of beer three times per week).  This notation

indicates that the diagnosis of alcohol abuse disorder was a possibility, and it should be

"ruled out," but that Dr. Hartman may not have had enough information from his one

visit with the plaintiff to make the determination.[11]

Plaintiff's previous medical records also show a history of alcohol abuse.  In

_____

[11] As stated above, the internal medicine consultant, Dr. Greene did make a diagnosis of
alcoholism. (T. 470).  At best, there is conflicting evidence in the record that is the province of the ALJ
to resolve. *Tammy S. o/b/o A.L.S.*, No. 1:20-CV-931 (DB), 2022 WL 1488431, at * 11 (W.D.N.Y. May
11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Schaal v. Apfel*, 134 F.3d 496,
501 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the
record"); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to
the Commissioner's resolution of conflicting evidence."). "'If evidence is susceptible to more than one
rational interpretation, the Commissioner's conclusions must be upheld.'" *Id.* (quoting *McIntyre v.
Colvin*, 758 F.3d 146, 149 (2d Cir. 2014)).

2015, he was hospitalized for alcohol withdrawal, and he was drinking 10-15 beers per day. (T. 286). At the hearing, plaintiff testified that he drank 6-12 cans of beer three days per week and admitted that he used alcohol to "self-medicat[e]." (T. 62-63). He testified that he was trying to cut down because he would like to be around to see his daughter get married. (T. 63). Thus, the ALJ's determination that plaintiff's alcoholism was a medically determinable, severe impairment is supported by substantial evidence, including a specific diagnosis by his own treating physician, further supported by Dr. Greene's consultative diagnosis.

In any event, any alleged error did not harm the plaintiff. The ALJ did not use plaintiff's alcoholism as a basis for denying his claim, and plaintiff makes no such argument.[12] Instead, plaintiff argues that the ALJ's error in finding that alcohol abuse disorder was a severe impairment "exemplified the ALJ's selective evaluation of evidence in other contexts, e.g. the evaluation of the B criteria in the listings of Impairments. [(T. 24).] It also exemplified the ALJ's conflation with a light exertional level, the need to alternately sit and stand, his age, past work and lack of transferrable skills." (Pl.'s Br. at 16).

Plaintiff may be arguing that the ALJ's selectivity in making her severity

---

[12] The ALJ proceeded to consider the subsequent steps in the sequential analysis. In fact, the ALJ later considered plaintiff's difficulty with stress, exacerbating his alcohol use disorder to limit plaintiff to a job with only occasional changes in the work environment. (T. 33). Generally, plaintiffs allege that the ALJ erred in **failing to find** that an impairment was severe. Because the ALJ did not use plaintiff's alcoholism to deny his claim, if she did make an error at step two, it was harmless. An error is harmless, and remand is not required, where the "'application of the correct legal principles to the record could lead only to the same conclusion.'" *Gonzalez v. Kijakasi*, No. 21-CV- 2685 (JLC), 2022 WL 3330346, at *9 (S.D.N.Y. August 12, 2022) (quoting *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted)) (other citations omitted).

determination carried through to the rest of her analysis.[13]  Plaintiff later argues that the ALJ engaged in "cherry picking" the evidence.  As stated above, this court finds that the ALJ did not err in her step two determination and will address plaintiff's subsequent claims of cherry picking below.

## IX.   LISTING OF IMPAIRMENTS

### A.   Legal Standards

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment.  *See* 20 C.F.R. §§ 404.1520, 416.920.  It is the plaintiff's burden to establish that his or her medical condition or conditions meet all of the specific medical criteria of particular listed impairments.  *Gabriel C. v. Comm'r of Soc. Sec.*, No. 6:18-CV-671 (ATB), 2019 WL 4466983, at *4 (N.D.N.Y. Sept. 18, 2019) (citing inter alia *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)).  "Nonetheless, the ALJ is required to explain why a claimant failed to meet or equal the listings [w]here the claimant's symptoms as described by the medical evidence appear to match those described in the Listings." *Ramirez Morales v. Berryhill,* No. 6:17-CV-06836, 2019 WL 1076088, at *3 (W.D.N.Y. Mar. 7, 2019) (quoting *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273 (N.D.N.Y. 2009) (citation and internal quotations omitted)).  If a plaintiff's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify.  *Debra E. v. Comm'r of Soc. Sec.*, No. 6:18-CV-513 (NAM), 2019 WL 4233162, at *6 (N.D.N.Y. Sept. 6, 2019) (quoting *Sullivan v. Zebley,*

---

[13] Even if the ALJ found alcoholism to be non-severe, the ALJ would have been entitled to consider it when making a determination at the subsequent steps. The regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923.

493 U.S. at 530).  In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

Obesity was eliminated as a listed disability in October of 1999. *See* S.S.R. 00-3p. The agency, however, has made changes to the listings to ensure that they still address obesity, and the description of obesity as a potential contributing factor to disability is now referenced in section 1.00(Q) of the Listings.  The regulations state that,

> [o]besity is a medically determinable impairment that is often associated with musculoskeletal disorders. Obesity increases stress on weight-bearing joints and may contribute to limitation of the range of motion of the skeletal spine and extremities. The combined effects of obesity with a musculoskeletal disorder can be greater than the effects of each of the impairments considered separately. We consider the additional and cumulative effects of your obesity when we determine whether you have a severe musculoskeletal disorder, a listing-level musculoskeletal disorder, a combination of impairments that medically equals the severity of a listed impairment, and when we assess your [RFC].

20 C.F.R. Pt. 404, subpt. P, App. 1 § 1.00(Q).

**B.   Analysis**

Plaintiff argues that the ALJ did not sufficiently explain whether plaintiff's obesity medically equaled the severity of a listed impairment in accordance with SSR 19-2p. (Pl.'s Br. at 20).  Plaintiff argues that this error affected the ALJ's analysis of all the listings.  Until 2019, the obesity regulations were governed by SSR 02-1p.  On May 20, 2019, the agency issued SSR 19-2p, replacing SSR 02-1p, and reflecting some new

research and other information regarding the effects of obesity. SSR 19-2p, 2019 WL 2374244, at *1-2 (2019).[14]   The 2019 ruling applies in this case. (T. 24).

The ALJ cited SSR 19-2p in her analysis of obesity during step three of the sequential evaluation. (T. 24).  She recognized that "the functional limitations caused by obesity might medically equal the criteria of some listing when considered alone or may increase the severity of a comorbid condition to the point that the combination of impairments equals the criteria of a listing." (*Id.*)  However, she found that the medical evidence of record did not indicate that the plaintiff's obesity rose to the level described by any listing. (*Id.*)  She also stated that plaintiff's obesity "in conjunction with" his other impairments did not medically equal "the criteria of another listed impairment." Finally, the ALJ stated that she considered the "effects" of plaintiff's obesity in assessing his RFC at step four. (*Id.*)

The ALJ considered each of the potential listed impairments and compared plaintiff's functional abilities to the requirements of the Listings, finding that plaintiff's impairments did not meet the requisite levels of severity. (T. 22-25).  As stated above, plaintiff's impairments must meet or medically equal all of the requirements of a listing. Although SSR 19-2p states that obesity **may** increase the severity of other comorbid

---

[14] The introduction to SSR 19-2p states that SSR 02-1p was published on September 12, 2002 to

> provide guidance on the evaluation of obesity in disability claims. Since then, we published several final rules that revise some of the criteria we use to evaluate disability claims under Titles II and XIV of the Act. We are issuing this SSR to reflect the changes to the rules we have published, and advances in medical knowledge, since publication of SSR 02-1p.

2019 WL 2374244, at *2.

conditions, the medical records show that the plaintiff's functional abilities did not rise to the level of the limitations required for a listed impairment, notwithstanding his obesity.

Plaintiff argues that "[the ALJ] ignored the fact that over time, [plaintiff's] obesity and sleep apnea as well as his other impairments medically equaled listing 1.04. 12.04 and 12.06. (Pl.'s Br. at 20).  Other than citing plaintiff's ankle surgery and injections for pain, the plaintiff does not specify how the ALJ erred in her determination of his physical impairments in relation to the requirements of the various listed impairments.

The ALJ considered Listing 1.02 (major dysfunction of a joint). (T. 22-23).  The listing requires "an inability to ambulate effectively." (T. 22).  The ALJ cited the definition of "ineffective ambulation," as described in the regulations at Listing 1.00(J). (T. 22-23).  The ALJ noted that "despite an occasionally antalgic gait due to his ***multiple musculoskeletal impairments***, [plaintiff] maintained good strength in the lower extremities and continued to ambulate independently without use of an assistive device throughout the longitudinal record."[15] (T. 23) (emphasis added).

The ALJ also considered Part B of Listing 1.02, which requires involvement of one peripheral joint in each upper extremity, resulting in an inability to perform fine and gross movements effectively, which is defined as an "extreme" loss of function,

---

[15] The medical records, cited by the ALJ, indicate a longitudinal history of "normal" or "steady" gait patterns, with occasional antalgic gait. (T. 322, 328, 332, 336 (antalgic), 384, 469, 497, 541 (antalgic gait), 546 (antalgic gait)).  However, notwithstanding the occasional antalgic gait, plaintiff's strength was "intact" in his bilateral lower limbs, except for his left ankle dorsiflexion, which on May 22, 2018 was 4/5. (T. 546).

preventing the plaintiff from preparing a simple meal, feeding himself, taking care of personal hygiene, sorting and handling papers or files, and placing files in a filing cabinet. (T. 23). The ALJ cited various parts of the record showing that plaintiff demonstrated good strength in both upper extremities, with intact grip strength and manipulative abilities, despite the decreased range of motion in his left shoulder. (T. 23) (*See* T. 384, 469-70). Plaintiff testified that, even though he dropped things, he generally had "normal" use of his hands, he was able to regularly lift 20 pounds and had no trouble with fine manipulations or taking care of personal hygiene. (T. 53, 55, 58-59).

In the ALJ's analysis of Listing 1.04 (disorders of the spine), she stated that, although imaging of plaintiff's lumbar spine showed mild stenosis and spondylosis, there was no evidence of the compromise of a nerve root or the spinal cord as required by the listing. (T. 23) (citing T. 543, 546). The ALJ also noted that plaintiff showed no motor loss, and despite his occasional antalgic gate, continued to ambulate independently. (T. 23) (various citations to the record omitted). Plaintiff makes no other reference to physical listings.

Although not directly related to plaintiff's obesity, the ALJ undertook an extensive analysis of the requirements of both Listings 12.04 and 12.06 with respect to plaintiff's mental impairments. (T. 24-25). Plaintiff argues that the ALJ "did not sufficiently evaluate the s [sic] "overlap" between . . . abilities to understand, remember, or apply information, and to concentrate, persist, or maintain pace-given the need to pay attention when using both abilities." (Pl.'s Br. at 20). In support of this

argument plaintiff cites the Revised Criteria for Evaluating Mental Disorders ("RCEMD"), 81 FR 66138-01, 2016 WL 5341732, at *66144 and argues that the "DSM-5 definitions for these terms are not consistent with how we have used these words in our program in the past . . . ," claiming that mild intellectual disabilities might have moderate or marked limitations "in understanding, remembering or applying information, depending on the facts." (Pl.'s Br. at 20-21).  Plaintiff further argues that the ALJ mischaracterized plaintiff's activities at home, that he slept a lot, and that his mental activity was minimal. (Pl.'s Br. at 21).

As defendant points out, plaintiff cites comments to the RCEMD that were ***not*** adopted by the Commissioner, and they do not somehow change the criteria for evaluation of mental impairments.  In any event, in this case, the ALJ looked to the medical records to determine that plaintiff had "mild" limitations in memory, understanding, remembering or applying simple or complex instructions, even with his continued alcohol use. (T. 24).  The ALJ cited records from both consulting and treating sources. (*See e.g.* (T. 24) (citing T. 463 (consultative), 670, 674, 682, 686, 690, 694, 698 (treating)).  Plaintiff had a "moderate" limitation in adapting or managing himself because he reported a history of social anxiety and difficulty managing stress that exacerbated his use of alcohol, with negative thoughts that at times interrupted his daily activities. (T. 25) (citing T. 460-61).  The longitudinal record did not support any greater limitations, and plaintiff did not meet the "B" criteria of the listings which require at least two "marked" or one "extreme" limitation. (T. 25).  Plaintiff has failed to show that the ALJ's assessment was not supported by substantial evidence and, thus,

her step-three analysis was proper.

## X.   RFC/WEIGHT OF THE EVIDENCE/CONSISTENCY

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements

regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267

(N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*,

728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v.*

*Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*,

307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a

narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No.

3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing

SSR 96-8p, 1996 WL 374184, at *7).

## 2.    Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record

and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL

374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues

are not "medical issues," but are "administrative findings." The responsibility for

determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL

374183, at *2. These issues include whether the plaintiff's impairments meet or equal a

listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether

the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner,

the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The

ALJ must clearly state the legal rules that he applies and the weight that he or she

accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL

3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

### 3.    Credibility/Consistency

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in*

*Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[16] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[17]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's

---

[16] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

[17] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings.

subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B. Analysis

The plaintiff makes a variety of arguments, all related to the ALJ's RFC determination. Plaintiff claims that the ALJ (1) failed to properly weigh the letters of treating physician, Dr. Merrihew; (2) failed to properly analyze plaintiff's complaints of pain and exertional limitations, and (3) failed to develop evidence regarding plaintiff's reported tendency to drop things.

First, the court notes that the new regulations regarding the evaluation of evidence apply in his case because his current application was filed after March of 2017. The "'most important factors'" to be considered when evaluating the persuasiveness of medical opinions and prior administrative medical findings are "'supportability'" and "'consistency.'" *Boswell v. Comm'r of Soc. Sec.*, No. 21 Civ. 2364 (JPC/GRJ), 2022 WL 3714669, at *4 (S.D.N.Y. Aug. 29, 2022) (citing 20 C.F.R. § 404.1520c(a)).

Plaintiff's treating primary care physician, Dr. Merrihew, submitted two letters.

The first letter was dated December 5, 2019 and was reviewed by the ALJ. (T. 581-82). The second letter was dated March 15, 2020 and was submitted to the Appeals Council. (T. 15).  In denying plaintiff's request for review, the Appeals Council found that Dr. Merrihew's second letter would not have changed the ALJ's decision and was not "exhibited."[18] (T. 2).

Dr. Merrihew's first letter was a laundry list of plaintiff's diagnoses, but the only functional limitation included in that letter was a "20 lb weight lifting limit" based on plaintiff's left shoulder replacement. (T. 581).  Dr. Merrihew's second letter was more detailed regarding plaintiff's diagnoses, including the reference to an MRI which showed compression deformities of the intervertebral discs with associated degenerative changes. (T. 15).  The doctor noted that injections had not helped with pain relief and that currently (in 2020), the plaintiff was taking hydrocodone, which made him drowsy and made it difficult to complete tasks, "making sedentary work all but out of the question." (*Id.*)  Dr. Merrihew also stated that "recently," plaintiff was experiencing bilateral arm and wrist pain due to carpal tunnel syndrome. (T. 15).

Other than his conclusory reference to sedentary work, Dr. Merrihew gave no medical opinion regarding plaintiff's functional abilities in his 2020 letter, and as defense counsel argues, Dr. Merrihew's statement that plaintiff's condition worsened in the last six months was not supported by the medical evidence in the record. (Def.'s Br. at 8-9) (citing T. 441, 476, 469-70, 522, 527, 536, 542-543, 488, 494, 497, 500) (all showing normal gait, full strength (except for his ankle which was rated 4/5), and good

---

[18] This means that the letter was not given an exhibit number even though it has become part of the record and may be considered by the court.

balance). The Appeals Council found that Dr. Merrihew's March 2020 letter would not have changed the ALJ's opinion, and that determination is supported by substantial evidence.[19] (T. 2).

Plaintiff argues that Dr. Merrihew's **diagnoses** are supported by the record.  The ALJ did not dispute the doctor's diagnoses, and in fact, used the 20 pound weight limit proposed by Dr. Merrihew in determining that plaintiff could perform light work with the additional restrictions, caused by the other medical impairments diagnosed by plaintiff's treating physician.[20]  The ALJ stated that Dr. Merrihew's 2019 statement regarding plaintiff's ability to lift was consistent with Dr. Greene's consultative examination, showing a decreased range of motion in the left shoulder and bilateral carpal tunnel syndrome with pain and tingling in both hands. (T. 33) (citing T. 469-70). The ALJ found Dr. Merrihew's 2019 opinion "persuasive."  A diagnosis alone does not direct a finding of disability. *Thomas Roy W. v. Comm'r of Soc. Sec.*, No. 8:19-CV-972 (GLS), 2020 WL 4365607, at *3 (N.D.N.Y. July 30, 2020) (diagnosis alone without a finding as to the severity of symptoms and limitations does not mandate a finding of disability) (quoting *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008); *Ogbunugafor v. Barnhart*, No. 01 Civ.10961 (SAS), 2002 WL 31886260, at *3 (S.D.N.Y. Dec. 27, 2002) (citation omitted).  Rather, the functional limitations caused by plaintiff's impairments should direct the ALJ's determination of plaintiff's RFC. *Id.*

In making the RFC determination, the ALJ carefully considered all the other

---

[19] As stated above, plaintiff's "date last insured" was December 31, 2019.  Thus, if his conditioned worsened after that date, it would not be relevant to the current application.

[20] Plaintiff testified that he could lift 20 pounds. (T. 53).

medical evidence and opinions in the record.  Although plaintiff argues that the ALJ

"omitted" or "failed to understand" evidence, plaintiff does not specify what evidence

the ALJ omitted or failed to understand.  A review of the ALJ's decision shows that she

carefully considered all of plaintiff's impairments, with citations to specific pages in the

record supporting her conclusions. (T. 26-33).  The ALJ considered plaintiff's obesity

(T. 27); cardiac impairments including atrial fibrillation, sycopal events, blood

pressure, and ablation procedures (T. 27-28); respiratory impairments and related sleep

apnea (T. 28); knee impairments, related previous surgeries, and upcoming knee

replacement (T. 28-29); ankle impairments, including his split tendon tear, together

with related limitations (T.  28-29); hip replacements; lower back impairments (T. 28-

29);[21] bilateral femoral cutaneous neuropathy (T. 29); carpal tunnel syndrome (T. 29-

30); and depression and anxiety (T. 30).

     The ALJ considered medical opinions from R. Mohanty, M.D., a consultative

state-agency physician, who opined that plaintiff could perform light work, with

frequent crawling an climbing, but only occasional reaching with the left upper

extremity. (T. 31) (citing T. 84-85).  However, the ALJ also recognized that Dr.

Mohanty did not see the entirety of the record, and found that Dr. Mohanty's opinion

was "generally consistent" with the record and "generally persuasive," in combination

with the other medical evidence. (T. 31).

---

[21] Although plaintiff argues that Dr. Merrihew's 2020 letter mentioned "an" MRI, confirming plaintiff's back impairments, the ALJ specifically referred to "imaging of the lumbar spine in May 2018," which "confirmed degenerative changes with spinal canal and foraminal stenosis." (T. 29).  The ALJ had already considered the diagnosis to which Dr. Merrihew may have been referring in his letter. Thus, the ALJ did not omit consideration of relevant evidence.

The ALJ discussed the opinions of two treating orthopedic surgeons, Dr. Kevin Rosas, M.D. and Dr. Jonathan Gainor, M.D. (T. 32).  On April 27, 2018, Dr. Gainor recommended that plaintiff avoid working in an environment which required him to get in and out of heavy machinery because such activities could aggravate plaintiff's back pain. (T. 32) (citing T. 548).  Dr. Rosas saw plaintiff for his left ankle arthritis and instability. (T. 513).  On June 20, 2019, Dr. Rosas stated that plaintiff should not return to work at a job involving prolonged standing or walking, but did not define how long plaintiff could perform either activity. (T. 32) (citing T. 513).

The ALJ found these opinions "generally persuasive" because, although they treated plaintiff during the relevant time period, the conclusions were not well supported or consistent with the evidence from both treating and examining providers which showed that plaintiff generally maintained full strength and an independent gait, despite an occasional decrease in range of motion in his back, left ankle, and left shoulder. (T. 32) (citing inter alia T. 470, 497, 541, 546).  The ALJ concluded that the findings reflected a need for some postural, exertional, and reaching limitations, but they were not consistent with the two doctor's proposed limitations. (*Id.*)  The court would also point out that the ALJ imposed restrictions that would compensate for plaintiff's limitations,[22] and the light work proposed by the VE did not involve getting in and out of heavy machinery.

With respect to plaintiff's mental impairments, the ALJ considered the opinion of

---

[22] Although Dr. Rosas stated that plaintiff could likely never return to a job which involved *prolonged* standing or walking, the VE proposed jobs in which the plaintiff could change positions "for comfort." (T. 26). Thus, plaintiff would not be required to perform the jobs that Dr. Rosas believed he could not do, and the ALJ's analysis of their opinions was supported by substantial evidence.

Dr. T. Bruni, Ph.D., a state agency psychological consultant, who found that plaintiff did not have a severe mental impairment. (T. 31).  The ALJ stated that the record was consistent with mild limitations in most areas of functioning.  However, plaintiff's persistent alcohol use to cope with stress and anxiety "supports finding a moderate limitation in adapting and managing himself." (*Id.*)  Because Dr. Bruni's opinion did not reflect that findings and did not appear consistent with the opinion of Dr. Brett Hartman's (the examining consultant), the ALJ found Dr. Bruni's opinion unpersuasive. (*Id.*)

The ALJ found Dr. Hartman's June 13, 2018 opinion "persuasive." (T. 32).  His opinions were supported by objective testing and consistent with the available mental health records which noted generally managed anxiety symptoms,[23] but ongoing problems with alcohol abuse. (T. 32) (citing inter alia T. 669-700).  These records are from plaintiff's treating internist, Dr. Merrihew, citing many normal findings, including intact memory, appropriate mood and affect, and normal speech. (*See e.g.* T. 700).

Plaintiff argues that the ALJ should have developed the evidence regarding his inability to grasp objects due to carpal tunnel syndrome; the length of time that he would be able to sit, stand, or walk before changing positions; and his mental

---

[23] On several occasions, plaintiff reported to Dr. Merrihew that the "medication helps" his anxiety. (T. 669, 672, 680, 684, 688, 692).  Plaintiff also reported varying levels of severity.  On April 18, 2019, plaintiff reported that the anxiety was 5/10 at its most intense, while in May of 2019, he reported that the anxiety was 3/10 at its most intense. (T. 699, 672).  In June of 2019, plaintiff reported that the anxiety was 4/10 at its most intense, and on August 29, 2019, plaintiff reported that the anxiety was 3/10 at its most intense. (T. 676, 684).  In December of 2019, Nurse Practitioner Kathleen Emerson noted that "patient with history of anxiety reports his symptoms are controlled with current medication regimen." (T. 698). Thus, the ALJ's finding that the plaintiff's anxiety symptoms were generally managed is supported by substantial evidence in the record.

impairments, including evidence regarding the frequency of his good and bad days.
(Pl.'s Br. at 17-20).  The ALJ has an affirmative duty to develop the record. *Pratts v.
Chater*, 94 F.3d 34, 37 (2d Cir. 1996).  However, the ALJ need not supplement the
record further when no gaps exist. *See Schillo v. Kijakazi*, 31 F.4th 64, 76 (2d Cir.
2022) (holding that the ALJ did not fail to develop the record when the claimant did not
identify missing medical records).

There are no gaps in this case, sufficient to require the ALJ to obtain additional
evidence regarding any of the functions asserted by plaintiff.  Plaintiff argues that the
ALJ should have obtained more information regarding plaintiff's ability to perform the
jobs listed by the VE because of the limitations posed by plaintiff's carpal tunnel
syndrome. (Pl.'s Br. at 17-18).  Plaintiff claims that the jobs proposed by the VE
required handling objects frequently, but plaintiff testified that he dropped things when
he reached into the refrigerator. (*Id.*)

In this case, the ALJ included manipulative restrictions in plaintiff's RFC,
limiting plaintiff to only occasional reaching in all directions with his left (non-
dominant) hand.  The ALJ's opinion was more restrictive than that of Dr. Greene, who
concluded that plaintiff had moderate to marked limitations for performing "overhead"
activities with his left upper extremity. (T. 26, 471).  However, although plaintiff
testified that he dropped things, he also testified that he could lift 20 pounds and that he
had no trouble with fine manipulation such as "buttoning buttons" or "tying shoes." (T.
58-59).  The ALJ cited the report of Dr. Todd Jorgenson, M.D., who performed the
electrodiagnositc study in 2017 and found that, while plaintiff "demonstrated

diminished sensation in the median distribution of both upper extremities, he maintained full strength throughout both hands, wrists, and elbows." (T. 29) (citing T. 382-84).  The ALJ also cited Dr. Greene's finding that plaintiff had 5/5 grip strength and "intact" finger and hand dexterity. (T. 30, 470).  Given the medical evidence supporting the ALJ's determination, she was not required to obtain additional evidence regarding the plaintiff's carpal tunnel syndrome or his ability to handle objects.

Plaintiff also argues that the ALJ failed to develop the record regarding the length of time that he could sit, stand, or walk before changing positions.[24]  The RFC included a requirement that plaintiff be able to change positions from sitting, standing, or walking "for comfort." (T. 26).  The ALJ considered plaintiff's own testimony that he would need to change positions for relief. (T. 33, 53, 60).  The VE testified that the individual would be able to change positions and not impede the work that he or she was performing. (T. 69).  The VE understood that the plaintiff would be required to change positions "at will." (*Id.*)  Thus, the ALJ was not required to obtain additional evidence regarding a specific amount of time that plaintiff could perform the various functions.

Plaintiff also argues that the ALJ should have developed evidence about the "extent and frequency of plaintiff's good and bad days." (Pl.'s Br. 19). Plaintiff does

---

[24] Plaintiff cites the program operations manual ("POMS") which provides that the need to alternate between sitting and standing might erode the occupational base of "sedentary work." (Pl.'s Br. at 18 & n.33).  The court would first point out that the ALJ found that plaintiff could perform "light," not "sedentary" work, and that the section cited by the plaintiff applies when the ALJ is considering using the Medical Vocational Guidelines. 20 C.F.R. Pt. 404, Subpt. P App. 2.  When the occupational base of work is eroded by additional restrictions, the ALJ must obtain a VE, and in this case, the ALJ did obtain a VE in order to determine what other work plaintiff could perform. *See* SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996).

not propose how the ALJ should have done this.  Instead, plaintiff cites to Dr. Hartman's consultative psychiatric report and states that the ALJ "selected" only the mild restrictions, while ignoring the "fair" or "moderate" restrictions. (*Id.*)  The ALJ did not "select" only the mild restrictions.  As stated above, Dr. Hartman's only "moderate" restriction was with respect to regulating emotions, and the ALJ limited plaintiff to only occasional changes in the work environment.[25] (T. 463).  Dr. Hartman stated that plaintiff had a "fair" ability to interact adequately with others and sustain an ordinary routine. (*Id.*)  Plaintiff notes that the Listings equate "moderate" with "fair," thus, plaintiff had "moderate" restrictions in his ability to interact with others and sustain an ordinary routine. (Pl.'s Br. at 10) (citing Listing 12.00(F)(2). Even if plaintiff had more than one moderate restriction, it would not prevent him from performing unskilled work with the additional restriction imposed by the ALJ. *See Shawn V. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0997 (WBC), 2021 WL 3022295, at *4 (W.D.N.Y. July 16, 2021) ("The Second Circuit has held that moderate limitations in work-related functioning does not significantly limit, and thus prevent, a plaintiff from performing unskilled work.") The ALJ did not have to include additional restrictions in the hypothetical to account for these moderate limitations. *Id.*

Plaintiff also argues that the ALJ mischaracterized his daily activities. (Pl.'s Br. at 19).  The ALJ did not mischaracterize the plaintiff's activities.  Rather, the ALJ found that plaintiff's statements regarding his activities, as well as his ability to

---

[25] The ALJ stated that "the claimant's noted difficulty managing stress and anxiety, particularly as it exacerbates his alcohol use disorder, supports limiting the claimant to only occasional changes in the work environment." (T. 33).  It is clear that the ALJ was not only "picking" the mild limitations, but was considering plaintiff's entire mental condition.

function, were not consistent with the evidence of record, including statements that he made to medical personnel. (T. 30).  Plaintiff argues that except for riding around the neighborhood in his truck with his dog or socializing with his brother, he stayed home and did little. (Pl.'s Br. at 19).  However, plaintiff told Dr. Hartman that he was able to take care of his personal hygiene, prepare simple meals, perform household chores with breaks, go shopping with his wife for 30 minutes at a time, watch television, check on his 80-year-old father, and use the computer. (T. 463).  Plaintiff told Dr. Greene that he cooked light meals six times per week, went shopping once a week with his wife, watched TV,[26] read, and went out to socialize with friends. (T. 468).  The ALJ included the plaintiff's statements in her opinion, concluding that "[u]ltimately, the objective evidence of record does not support the claimant's subjective symptom reports. (T. 30-31, 33).  The ALJ also considered that, despite some limitations, including a limited range of motion in his left shoulder, the plaintiff maintained good strength in his upper and lower extremities. (T. 30).

The ALJ properly analyzed plaintiff's subjective symptoms. She cited the two-part standard governing the analysis of subjective complaints. (T. 26).  She discussed plaintiff's allegations regarding his limitations, as discussed above, including the effects of medication, and any aggravating factors.[27]  Although the ALJ recognized that plaintiff's medically determinable impairments could cause his symptoms, she found that his statements concerning the intensity, persistence, and limiting effects

---

[26] At the hearing, plaintiff testified that he watched hockey twice per week. (T. 55).

[27] The ALJ specifically took into consideration plaintiff's difficulty dealing with stress and self-medication with alcohol affecting his functional abilities. (T. 31).

of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (T. 27).

Plaintiff claims that the ALJ ignored plaintiff's statements about the frequency of his palpitations. (Pl.'s Br. at 22-23).  The ALJ undertook an extensive discussion of the history of plaintiff's cardiac impairment. (T. 27-28).  She noted his history of atrial fibrillation, which was initially stabilized, but recurred in March of 2018, when plaintiff reported to Dr. Iqbal possible episodes "once or twice per week for the past six months." (T. 27) (citing T. 420).  However, when he checked his pulse during these episodes, "it was regular." (*Id.*)  Plaintiff had started walking a mile each day, which improved his exercise tolerance. (T. 27) (citing T. 420-21).

The ALJ recognized that later in 2018, plaintiff returned to the cardiologist complaining of increased fatigue and episodes of palpitation, although he denied syncope or near syncope. (T. 27) (citing T. 487).  The report cited by the ALJ includes plaintiff's statement that he was having episodes two to three times per week lasting up to 45 minutes. (T. 488).  The ALJ stated that cardiologists recommended a cardioversion procedure, which was performed in September of 2018. (T. 27).  The ALJ then discussed plaintiff's subsequent repeat ablation. (T. 28).  Although plaintiff's pulmonary care providers noted that he continued to experience some symptoms in 2019, plaintiff could speak in complete sentences, without shortness of breath, maintained normal breath sounds, blood pressure and heart rhythm.[28] (T. 28) (citing T.

---

[28] The report cited by the ALJ was written in February of 2019 by plaintiff's pulmonary physician Surendra Nevatia, M.D. while examining plaintiff to clear him for his ankle surgery. (T. 499).

500).  The ALJ did not "ignore" plaintiff's cardiac impairment.[29]  While the ALJ may not simply "cherry pick" the evidence, she is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).

Plaintiff argues that the ALJ failed to properly consider plaintiff's claims of daytime somnolence and failed to include this symptom in the RFC.  Plaintiff testified that his sleep apnea made him tired during the day and that his anxiety medication, Klonopin made him drowsy. (T. 52, 59).  However, the court notes that in 2019, during the follow up examinations with Dr. Merrihew's office for his anxiety, plaintiff denied fatigue and insomnia. (T. 674, 678, 682, 686, 690, 694, 698).  Thus, the ALJ did not err in failing to include plaintiff's alleged drowsiness in the RFC.

Finally, plaintiff argues that the ALJ did not adequately evaluate plaintiff's "forgetfulness," citing Dr. Hartman's report, finding that plaintiff made errors in calculation and was slow with "serial 7s." (Pl.'s Br. at 23).  While plaintiff's citation to the record is correct, Dr. Hartman concluded, nothwithstanding the errors and slowness, plaintiff's attention, concentration, and memory were only "mildly" impaired. (T. 462-63).  The court notes that reports from Dr. Merrihew and NP Emerson throughout 2019 indicate "intact" memory, normal mood and affect, appropriate speech, and normal

---

[29] The court notes that in October of 2018, plaintiff told Dr. Tan that other than the palpitations, chest tightness, and "sometimes" shortness of breath, he did not have any lightheadedness, dizziness, syncope or near syncope. (T. 497).  Plaintiff's physical examination on the same day showed "regular rate and rhythm." (*Id.*)

thought content. (T. 670, 674, 678, 682, 686, 690, 694, 699).  As stated above, even a moderate impairment in mental functioning will not prevent the individual from performing unskilled work.  Thus, the ALJ did not err in her evaluation of the plaintiff's memory or in failing to add a further limitation to the RFC.

Plaintiff claims that the ALJ did not properly consider the combination of his impairments in determining the RFC. (Pl.'s Br. at 23-24).  The ALJ specifically stated that she was considering plaintiff's impairments in combination when determining plaintiff's RFC. (T. 20, 21, 26, 27).  There is no indication in her analysis that she did not do so.  In fact, the RFC specifically covers the combination of plaintiff's physical and mental impairments, incorporating plaintiff's need to change positions, his left-sided reaching limitations, and his difficulty handling stress.  Thus, the plaintiff's argument in this regard must fail.

## XI.   STEP FIVE AND VOCATIONAL EXPERT

### A.   Legal Standards

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." *McCusker v. Comm'r of Soc. Sec.*, No. 1:13-CV-1074, 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (quoting SSR 82-53, 1982 WL 3134, at *3 (1982) (internal quotation marks removed).

In the ordinary case, the ALJ carries out this fifth step of the sequential disability

analysis by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.*

The Grids divide work into sedentary, light, medium, heavy, and very heavy categories,

based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull.

20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2

(S.D.N.Y. 1996).  *See also* 20 C.F.R. §§ 404.1567 & 416.967.  Each exertional category

of work has its own Grid, which then takes into account the plaintiff's age, education,

and previous work experience.  *Id.*  Based on these factors, the Grids help the ALJ

determine whether plaintiff can engage in any other substantial work that exists in the

national economy.  *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is

inappropriate' when they do not fully account for the claimant's limitations." *Martin v.

Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted).  When significant

nonexertional impairments[30] are present or when exertional impairments do not fit

squarely within Grid categories, the testimony of a vocational expert is required to

support a finding of residual functional capacity for substantial gainful activity.

*McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar.

27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a

hypothetical question that incorporates plaintiff's limitations.  *See Aubeuf v. Schweiker*,

649 F.2d 107, 114 (2d Cir. 1981).  Although the ALJ is initially responsible for

---

[30] A "nonexertional" limitation is a limitation or restriction imposed by impairments and
related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs
other than the strength demands.  20 C.F.R. §§ 404.1569a(c), 416.969a(c).

determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony.  *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996).  Conversely, the ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009).  Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277.

### B.    Analysis

Plaintiff argues that the ALJ conflated light and sedentary work, age, and transferability of skills, and that if the ALJ had utilized the Medical Vocational Guidelines ("the Grids") for sedentary work,[31] they would have directed a finding of disabled. (Pl.'s Br. at 24).  However, the ALJ found that plaintiff could perform a range of light work, with the additional requirement of a sit-stand option, in addition to the reaching and mental restrictions noted above.[32]  The VE specifically stated that there were at least three jobs in the light work category in which the plaintiff could sit or stand for comfort, required only occasional reaching with his left hand, and which had

---

[31] In support of his argument, plaintiff cites 20 C.F.R. Pt. 404, Subpt. P., App. 2 § 201.10.

[32] This is further evidence that the ALJ was considering the "combination" of plaintiff's impairments to arrive at the appropriate RFC.

only occasional changes in the work environment.

Plaintiff's argument regarding transferability of skills and age is unclear as the ALJ's hypothetical asked for unskilled work, where transferability is not an issue, and the ALJ used the "closely approaching advanced age category" which is the oldest category applicable to plaintiff. (*See* T. 67) (hypothetical question).

Plaintiff argues that the VE's testimony is flawed, and has attached the Dictionary Of Occupational Titles ("DOT") descriptions for two of the jobs that she proposed.[33] (Pl.'s Br. at 25 & Pl.'s App. 1-3).  Plaintiff argues that the show that the jobs proposed by the VE, sales attendant, cashier II, and ticket taker all require "frequent" reaching.  Thus, plaintiff's RFC does not fit into these descriptions because the ALJ noted that he could reach only "occasionally" with his left arm.

The DOT gives a job type a specific code.  In this case, Cashier II is listed in the DOT as "211.462–010 Cashier II."  The listing establishes, among other things, the minimum skill and physical exertion levels required to perform that job. (Pl.'s App. 2).  A VE whose evidence conflicts with the DOT must provide a "reasonable explanation" to the ALJ for the conflict. *Brault*, 683 F.3d at 446 (citing *See* Social Security Ruling (SSR) 00-4p, Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, 2000 WL 1898704 (Dec. 4, 2000)).

---

[33] The court notes that Appendix 1 and 2 are Sales Attendant and Cashier II respectively. (Pl.'s App. 1-2).  Plaintiff's Appendix 3 is a duplicate of the Sales Attendant description.  Plaintiff has failed to include a DOT description for the Ticket Taker position, but the court is aware of the argument that plaintiff is attempting to make and will discuss the exhibits as if a description of all three jobs had been attached.

It is true that the jobs listed by the VE require "frequent" reaching.  However, at the hearing, the VE clearly and reasonably explained the discrepancy.[34]  She testified that plaintiff's limitation to "occasional reaching" on the left side would not affect his ability to perform these jobs because "[he] could primarily use [his] right upper extremity, which also happens to be the dominant hand and so the left upper extremity would only need to reach occasionally." (T. 68).  The VE also opined that an individual who needed to change positions "for comfort" could also perform these jobs.  In response to a question from plaintiff's attorney, the VE testified that an individual who could only perform one activity for approximately 20 minutes before having to change positions could still perform the jobs of ticket taker and cashier II. (T. 70).  The VE based her testimony on the DOT and her experience "in the field of rehabilitation." (T. 72).  Thus, the fact that the DOT requires "frequent" reaching in the occupations cited by the VE does not create a discrepancy in her testimony and does not change plaintiff's ability to perform the jobs because there is no requirement that the frequent reaching must be bilateral, and there was no limitation on plaintiff's ability to reach with his right upper extremity.

Finally, plaintiff argues that the VE erred because she proposed only national job numbers, rather that regional numbers. (Pl.'s Br. at 25).  As long as the VE shows one job "in the national economy" that plaintiff can perform, the Commissioner has met his burden at step five. *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (citing 42

---

[34] Prior to the VE's testimony, the ALJ instructed her to explain any of her opinions that differed from the DOT, "advise us of the difference and give us a basis for your opinion or definition." (T. 65).

U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)).  There is also no requirement that a VE "identify with specificity the figures or sources supporting [her] conclusion, at least where [she] identified the sources generally." *Bonilla- Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 354-55 (S.D.N.Y. 2019) (quoting *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014)).

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT**.

Dated: September 7, 2022

Andrew T. Baxter
U.S. Magistrate Judge